# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| JEFF JOHNSTON, JOHN SANDVIKS AND TANNER KIRCHOFF, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PhD FITNESS, LLC, a California Limited Liability Company, | ) CLASS ACTION ) ) Case No. |
| Defendant. | ) ) **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Jeff Johnston, John Sandviks and Tanner Kirchoff ("Plaintiffs"), individually and on behalf of all others similarly situated, based on the investigation of counsel and their own individual knowledge as to Plaintiffs' own circumstances, hereby complains against Defendant PhD Fitness, LLC ("Defendant" or "PhD") as follows:

## I.    INTRODUCTION

1.    PhD formulates, manufactures, advertises and sells the popular Pre-JYM and Post-JYM sport supplements (the "Products") throughout the United States, including in Michigan, South Carolina and Washington.  However, PhD markets these Products in a systematically misleading manner, stating that its products have characteristics and benefits that they do not.

2.    Defendant's multiple and prominent misrepresentations regarding its sport supplements form a pattern of unlawful and unfair business practices that harms the consuming public.

3.    Jim Stoppani, the face and member of Defendant PhD Fitness, LLC, boasts of his expertise in sports supplementation throughout his marketing materials and labels of the Products.  However, although Stoppani consistently claims that all of the ingredients in his products are scientifically supported and

2

dosed properly, they are not.   In reality, Stoppani and Defendant deceive consumers in the same exact way as their competitors.

4.      These actions violate a number of state consumer protections laws, including the Michigan Consumer Protection Act ("MCPA") and the Washington Consumer Protection Act ("WCPA").  Defendant's actions have injured Plaintiffs and members of the Class, therefore Plaintiffs seek actual damages, restitution and/or disgorgement, and any injunctive or equitable relief deemed proper by the Court.

## II.     PARTIES

*Plaintiffs*

5.      During the relevant period, members of the Class throughout the United States purchased the Products through numerous brick-and-mortar retail locations and online websites. Plaintiffs and members of the Class suffered an injury in fact caused by the false,  fraudulent, unfair, deceptive, and misleading practices set forth in this Complaint. Plaintiffs and members of the Class would not have purchased the Products had they known the true nature of the ingredients and their dosing.

6.      Plaintiff Jeff Johnston ("Johnston") is, and at all times relevant hereto was a resident of Michigan and a citizen of Michigan.   Specifically, Plaintiff resides in Fowlerville, Michigan.   Plaintiff Johnston has purchased several of

Defendant's products, including Pre-JYM and Post-JYM. Plaintiff Johnston most recently purchased Defendant's Pre-JYM and Post-JYM products at a GNC store located in Hartland, Michigan approximately on October 24th, 2016.

7.     Plaintiff John Sandviks ("Sandviks") is, and at all times relevant hereto was a resident of South Carolina and a citizen of South Carolina. Specifically, Plaintiff resides in Aiken, South Carolina.  Plaintiff Sandvik has purchased several of Defendant's products, including Pre-JYM and Post-JYM. Plaintiff Sandvik has purchased Defendant's Pre-JYM and Post-JYM products at a Bodybuilding.com numerous times over the past year and a half.

8.     Plaintiff Tanner Kirchoff ("Kirchoff") is, and at all times relevant hereto was a resident of Washington and a citizen of Washington.  Specifically, Plaintiff resides in Seattle, Washington.  Plaintiff Kirchoff has purchased several of Defendant's products, including Pre-JYM and Post-JYM. Plaintiff Kirchoff most recently purchased Defendant's Pre-JYM and Post-JYM products at a GNC store located at 4630 25th Ave NE, Seattle, Washington approximately on October 3rd, 2016, but has also purchased these Products numerous times through Bodybuilding.com.

***Defendant***

9.     Defendant PhD Fitness, LLC is a California Limited Liability Company with its headquarters in Thousand Oaks, California. PhD Fitness

manufactures sports-oriented dietary supplement products. PhD manufactures, markets, advertises, distributes and sells a line of sport supplement products in Michigan, Washington and throughout the United States.

### III.   JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction over Plaintiffs' class claims pursuant to 28 U.S.C. § 1332(d) because the combined claims of the proposed Class Members exceed $5,000,000 and because Defendant is a citizen of a different state than Plaintiffs and most Class Members.

11.    This Court has personal jurisdiction over the Defendant because they regularly conducts business in this District.

12.    Venue is proper in this District pursuant to: (1) 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (2) 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in this District.

### IV.   FACTUAL ALLEGATIONS

**A. Misrepresentations Regarding Defendant's Products Sold Exclusively at Bodybuilding.com.**

13.    On July 19, 2013 PhD started the JYM dietary supplement line through an exclusive deal with online retail giant Bodybuilding.com by offering its products in interstate commerce.  On May 17, 2016 the exclusive deal between

5

PhD and Bodybuilding.com expired.

14.     Every consumer that purchased the Products during this time period was exposed to the same materials which were at the point of purchase on the Bodybuilding.com website.

## Pre-JYM Claims

15.     Defendant falsely claims that the Pre-JYM product uses "Proper Doses" and blames competitors of misleading consumers by stating that they are "still guilty of grossly underdosing ingredients":

**Proper Doses**
For the reasons detailed above, many supplement companies are moving toward transparency and axing proprietary blends. That's a good thing. However, these companies are still guilty of grossly underdosing ingredients.

16.     Defendant goes further in its misleading marketing claims by stating that the Pre-JYM product "contains 13 ingredients at proper, powerful doses" and "Full doses of 13 science-backed ingredients":

**No Concentrates**
Many companies also try to trick buyers by calling their pre-workout product "concentrated." A serving of one of these "concentrated" products can contain as few as 3 to 6 grams of powder. What kind of magic did they use to cram enough creatine, beta-alanine, citrulline, arginine, caffeine, and other ingredients into that tiny dose? They didn't use any magic, which is why all of those "concentrated" formulas also include proprietary blends. That's also why the serving size of Pre JYM is more than 26 grams. It contains 13 ingredients at proper, powerful doses.

6

## Pre JYM Features

- *Full doses of 13 science-backed ingredients.*
- *6 grams of citrulline malate to promote better muscle endurance and bigger muscle pumps.\**
- *6 grams of BCAAs in the 2:1:1 ratio best for blunting muscle fatigue, boosting muscle performance, and promoting muscle growth.\**
- *2 grams of creatine HCL for greater strength, endurance, and the promotion of muscle growth.\**
- *2 grams of CarnoSyn® beta-alanine to promote muscle power, strength, endurance, and muscle growth.\**
- *1.5 grams of betaine for greater power and strength during workouts.\**
- *600 milligrams of N-acetyl L-cysteine to blunt muscle fatigue and keep you training stronger, longer.\**
- *500 milligrams of betavulgaris L.(beet) extract to provide real nitric oxide donors for bigger pumps and better energy.\**
- *300 milligrams of caffeine to boost alertness and drive, increase muscle strength and endurance, during workouts for greater training intensity.\**
- *300 milligrams of Alpha-GPC for better drive, focus, and strength in the gym.\**
- *50 micrograms of huperzine A to increase mental focus and establish a stronger mind-muscle connection.\**
- *5 milligrams of BioPerine® to enhance absorption of the active ingredients in Pre JYM for even better results.\**

17.    However, the Pre-JYM product has ingredients which are not backed by science, proven to be ineffective by scientific literature and many that are under-dosed for the claims that they make.

*Creatine HCL*

18.    Defendant includes 2 grams of Creatine HCL which they claim produces greater strength, endurance, and the promotion of muscle growth.

19.    This claim and dosage is based on the assumption that Creatine HCL produces the same results as Creatine Monohydrate at a much smaller dose ("micro-dosing") because Creatine HCL is more water-soluble.    There is absolutely no scientific backing that Creatine HCL produces greater strength,

7

endurance, and muscle growth.

20.    In fact, the theory of micro-dosing is fatally flawed.

21.    First, Defendant fails to realize that the bioavailability of creatine is the key to the effectiveness of the compound, not the water-solubility.

22.    Bioavailability is determined by how much of the compound is absorbed into the blood and ultimately the muscles.

23.    Creatine Monohydrate has been found in a number of studies to be completely absorbed by the GI tract[1].   It has also been demonstrated that conversion of creatine to creatinine in the GI tract is negligible with respect to transit duration, suggesting that arterial bioavailability of CM is approximately 100%[2].

24.    Again, there is no scientific backing for the claims Defendant associates with Creatine HCL.

---

[1] *See* Chantuin A. The fate of creatine when administered to man. *J Biochem*. 67:29-41, 1926., *See also* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008.

[2] *See* Deldicque L, Decombaz J, Foncea H, Vuichoud J Poortmans J, Francaux M. Kinetics of creatine ingested as a food ingredient. *Eur J Appl Physiol*. 102:133-43, 2008. *See also* Persky A, Muller M, Derendorf J, Grant M, Brazeau G, Hochhaus G. Single- and multiple-dose pharmokinectics of oral creatine. *J Clin Pharmacol*. 43:29-37, 2003.   *See also* Poortmans J, Auquier H, Renaut V, Durussel A, Saugy M, Brisson G. Effect of short-term creatine supplementation on renal responses in men. *Eur J Appl Physiol*. 76:566-67, 1997.   *See also* Schedel J, Tanaka H, Kiyonaga A, Shindo M, Schutz Y. Actue creatine ingestion in human: Consequences on serum creatine an creatinine concentrations. *Life Sciences*. 65:2463-70, 1999.

8

*CarnoSyn Beta-Alanine*

25.    Defendant adds 2 grams of CarnoSyn beta-alanine to promote muscle power, strength, endurance, and muscle growth.

26.    The patented beta-alanine product, CarnoSyn, that the Defendant includes in the Pre-JYM product lists the supported claims and the scientific studies that are purported to support those claims on their website www.carnosyn.com.

27.    First, one study claims that CarnoSyn increases the working capacity of muscle.[3]  However, the study was conducted with not only Carnosyn, but in conjunction with Creatine Monohydrate.  Also, the participants ingested 1.6 grams of CarnoSyn four times a day for the first six days and two times a day for the remaining twenty-two days.  This dosing protocol is greater than Defendant's dosing of 2 grams per serving.

28.    Second, another study claims that CarnoSyn increases muscle strength.[4] The study participants were given a dosing protocol of 1.6 grams twice daily, again a higher dose than Defendant's Pre-JYM product.

-----

[3]  Stout JR, et al., 2006. *Effects of twenty-eight days of beta-alanine and creatine monohydrate supplementation on the physical working capacity at the neuromuscular fatigue threshold.* J Strngth & Cond. Rsrch, 20(4): 928-931.

[4] Hoffman J, et al., 2006. *Effect of creatine and beta-alanine supplementation on performance and endocrine responses in strength/power athletes.* Int J Sport Nutr & Exer Metab., 16: 430-446.

29.    Third, another study claims that CarnoSyn improves muscular endurance.[5]  This dosing protocol was also higher than 2 grams per day where the participants used 6 grams per day for the first 21 days and 3 grams per day for the remaining 21 days.

30.    Also, a study that gave participants 4.8 grams per day of beta-alanine failed to improve 400-M sprint times.[6]

31.    Further, there are no scientific studies that show this ingredient's efficacy using one dose per day, at the recommended level contained within the Product.

32.    In fact, Jim Stoppani actually recommends two doses of 1.5-2g per day and even states that 2-3g given twice per day "makes sense".[7]  Both of which are obviously higher recommended dosing protocols than what he includes in the Pre-JYM product.

*Betaine*

33.    The Pre-JYM product includes 1.5 grams of Betaine in the

---

[5] Smith A E, et al., 2009. *Effects of beta-alanine supplementation and high level intensity interval training on endurance performance and body composition in men—a double-blind trial.* J Int Soc Sports Nutr., 6: 5.

[6] Derave W, et al., 2007. *beta-Alanine supplementation augments muscle carnosine content and attenuates fatigue during repeated isokinetic contraction bouts in trained sprinters.* J Appl Physiol 103(5):1736-43.

[7] *See* http://www.bodybuilding.com/fun/your-expert-guide-to-carnosyn-beta-alanine.html (Last visited October 21, 2016).

formulation that Defendant claims provides "greater power and strength during workouts".

34.    There are numerous studies that show a modest increase in power output after Betaine supplementation, but again, these dosing protocols were all at an increased level of 2.5 grams per day.[8,9]

35.    There are also several studies that show at 2-2.5 grams per day of Betaine actually have no effect on power output.[10,11,12]

*N-acetyl L-cysteine*

36.    The Pre-JYM product includes 600 mg of N-acetyl L-cysteine in the formulation that Defendant claims "*blunt[s] muscle fatigue and keep you training stronger, longer.*"

37.    There have been some studies showing this efficacy, but not at the dosing protocol in the Pre-JYM product:

---

[8]  Lee EC, et al. 2010. *Ergogenic effects of betaine supplementation on strength and power performance.* J Int Soc Sports Nutr. 7:27.

[9]  Pryor JL, et al. 2012. *Effect of betaine supplementation on cycling sprint performance.* J Int Soc Sports Nutr 9(1):12.

[10] Trepanowski TF, et al. 2011. *The effects of chronic betaine supplementation on exercise performance, skeletal muscle oxygen saturation and associated biochemical parameters in resistance trained men.* J Int Soc Sports Nutr. Dec;25(12):3461-71.

[11] Hoffman JR, et al. 2011. *Effect of 15 days of betaine ingestion on concentric and eccentric force outputs during isokinetic exercise.* J Strength Cond Res. Aug;25(8):2235-41.

[12] Hoffman JR, et al. 2009. *Effect of betaine supplementation on power performance and fatigue.* J Int Soc Sports Nutr. Feb 27;6:7.

"Although there is technically an antifatigue effect associated with N-Acetylcysteine, it require a very large dose as well as injections thereof; even then the antifatigue effect is small in magnitude"[13]

### Alpha-GPC

38.     The Pre-JYM product includes 300 milligrams of Alpha-GPC in the formulation that Defendant claims provides "better drive, focus, and strength in the gym".

39.     The only study that shows Alpha-GPC increases strength uses 600mg, twice the dosing of Pre-JYM.[14]

### Taurine

40.     The Pre-JYM product also contains 1 gram of Taurine which Defendant claims to aid in endurance, muscle strength and increase nitric oxide:

**1g of Taurine**

- Taurine is a specialized amino acid that is important for endurance and muscle strength. It can also increase nitric oxide (NO) production.*
- Exercise depletes taurine levels, thereby impairing strength and endurance, so it's helpful to get a dose of taurine before every workout.*

41.     There are no reliable scientific studies to support the claims Defendant makes for its 1 gram of Taurine in the Pre-JYM product.

---

[13] *See* https://examine.com/supplements/n-acetylcysteine/ (Last visited October 3, 2016).

[14]     Ziegenfuss T, et al. 2008. *Acute supplementation with alpha-glycerylphosphorylcholine augments growth hormone response to, and peak force production during, resistance exercise.* Journal of the International Society of Sports Nutrition20085 (Suppl 1):P15.

*Bioperine*

42.     The Pre-JYM product also contains 5mg of Bioperine, which Defendant claims "increases the absorption of those supplements by 30 to 2,000 percent":

**5mg of BioPerine®**

- BioPerine® is a patented extract of the fruit of black pepper, or long pepper, that contains standardized amounts of the active ingredient piperine.
- Numerous clinical studies suggest that when a 5 mg dose of BioPerine® is taken with other supplements, it increases the absorption of those supplements by 30 to 2,000 percent.*

43.     This claim may be true, but the studies that support these claims are for specific ingredients, none of which are contained within the Products.  These specific studies were only conducted on Beta-Carotene, CoQ10, Curcumin, Iron, Resveratrol, Selenium and Vitamin B6.[15]

44.     Again, this ingredient has no scientific backing as applied to these Products.

**Post-JYM Claims**

45.     Defendant falsely claims that the Post-JYM product has "proper dosing on all ingredients", "All eight of the ingredients in Post JYM are critical for recovery" and "Every single ingredient is included at the best dose to optimize repair and growth":

---

[15] *See* http://www.bioperine.com/index.php/researchhighlight (Last visited October 24, 2016).

Like every JYM product, Post JYM contains no proprietary blends, proper dosing on all ingredients, no "abbreviated" formulas, no concentrates, and no BS. All eight of the ingredients in Post JYM are critical for recovery.* There is no filler. Every single ingredient is included at the best dose to optimize repair and growth.* That's the power, and promise, of Post JYM.

46.     But as shown in the Pre-JYM product Creatine HCL, CarnoSyn, Betaine, Bioperine are not properly dosed or have no scientific backing at all.

47.     Post-JYM also contains 3 grams of L-Glutamine which Defendant claims "ramp(s) up post-workout repair", "is important for muscle recovery and growth", and "Research suggests that supplementation with glutamine allows subjects to recover quicker between workouts":

Post JYM Active Ingredients Matrix also contains carnitine and glutamine, which are important to quickly ramp up post-workout repair.* In addition, you can also purchase Post JYM dextrose separately.

### 3 grams of Glutamine

- Glutamine is one of the most abundant amino acids in the body and is important for muscle recovery and growth.*
- Research suggests that supplementing with glutamine allows subjects to recover quicker between workouts.*
- Glutamine is also critical for optimal immune function.* Intense training can compromise your immune system, which can derail your training and results. Glutamine can help maintain a healthy immune system and keep your training and results on track.

48.     Simply because a substance, such as glutamine, is a nutrient, does not necessarily mean that its enhanced use is beneficial. Glutamine naturally found

within the body does play a role in certain mechanisms supporting muscle growth, recovery and immunity support.

49.    However, as noted in the numerous scientific citations contained herein, glutamine supplementation has been found to be completely ineffective at mimicking these physiological responses.

50.    Simply put, the ingestion of L-Glutamine does absolutely nothing for the recovery from exercise, recovery of muscle tissue or ability to decrease muscle wasting (anti-catabolic).

51.    Defendant's recovery and muscle building claims, however, are blatantly false according to numerous scientific research papers, as contained herein.

52.    "Recovery" in bodybuilding is the process of the fatigued muscles to recuperate and grow after resistance training. This process enables the body to undergo muscle growth.

53.    In one study, glutamine failed to affect muscle protein kinetics of the test subjects.[16]

---

[16] Gore D., Wolfe R. Glutamine supplementation fails to affect muscle protein kinetics in critically ill patients. *JPEN J Parenter Enteral Nutr*, 2002, 26:342-49.

54.     In a study involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to 0.4 grams/kg, which revealed that glutamine supplement did not stimulate muscle protein synthesis.[17]

55.     Another study investigated the effect of L-glutamine supplementation on the plasma and muscle tissue glutamine concentrations of exercise-trained rats, both immediately and three hours after a single exercise session until exhaustion. In that study, rats were subjected to 60 minutes of swimming exercise daily for six weeks. During the final three weeks, one group was given a daily dose of L-glutamine (1 gram/kg). The plasma and muscle glutamine levels were higher than placebo during the post-exhaustive recovery period; however, this increase had no effect on the exercise swim test to exhaustion performance, suggesting that elevations in plasma and muscle glutamine levels have no benefit on muscle performance.[18]

56.     An additional study was also conducted to assess the effect of oral glutamine supplementation combined with resistance training in young adults. Subjects received either placebo (0.9 grams/kg fat-free mass/day of maltodextrin)

---

[17] Svanberg E., Moller-Loswick A., Matthews D., Korner U., Lundholm K. The effect of glutamine on protein balance and amino acid flux across arm and leg tissues in healthy volunteers. *Clin Physiol*, 2001, 4:478-89.

[18] Rogero M., Tirapequi J., Pedrose R., Castro I., Pires I. Effect of alanyl-glutamine supplementation on plasma and tissue glutamine concentrations in rats submitted to exhaustive exercise. *Nutrition*, 2006, 22:564-71.

or L-glutamine (0.9 grams/kg fat-free mass/day) during six weeks of resistance training. Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups. This study demonstrated that L-glutamine supplementation during resistance training had no significant effect on muscle performance, body composition, or muscle protein degradation in young, healthy adults.[19]

57. Moreover, a study was performed to examine the effects of a combination of effervescent creatine, ribose, and glutamine on muscle strength, endurance, and body composition in resistance-trained men. Subjects performed resistance training while ingesting either placebo or an experimental supplement (5 grams of creatine, 3 grams of glutamine, and 2 grams ribose) for eight weeks. Both groups significantly improved muscle strength, endurance, and fat-free mass, yet the groups were not significantly different from one another. Therefore, the experimental supplement, which included glutamine, was no more effective than placebo in improving skeletal muscle adaptation to resistance training.[20]

---

[19] Candow D., Chilibeck P., Burke D, Davison K., Smith-Palmer T. Effect of glutamine supplementation combined with resistance training in young adults. *Eur J Appl Physiol*, 2001, 86:142-49.

[20] Falk D., Heelan K., Thyfault J., Koch A. Effects of effervescent creatine, ribose, and glutamine supplementation on muscle strength, muscular endurance, and body composition. *J Strength Cond Res*, 2003, 17:810-16.

58.     Another study sought to determine the effects of eight weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures.  Subjects were randomly assigned to receive either placebo for eight weeks, creatine monohydrate (0.3 grams/kg/day for one week and then 0.03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of glutamine per day while engaged in a resistance training program. Body mass and fat-free mass increased in the creatine and creatine + glutamine groups at a greater rate than with placebo. Additionally, the two experimental groups underwent a significantly greater improvement in the initial rate of muscle power production compared to placebo. These results suggest that the creatine and creatine + glutamine groups were equally effective in producing skeletal adaptation to resistance training and that glutamine apparently had no preferential effect in augmenting the results.[21]

59.     One study was performed to determine if high-dose glutamine ingestion affected weightlifting performance. In a double-blind, placebo-controlled, crossover study, resistance-trained men performed weightlifting exercises one hour after ingesting placebo (calorie-free fruit juice) or glutamine (0.3 g/kg) mixed with calorie-free fruit juice. Results demonstrated no significant

---

[21] Lehmkuhl M., Malone M., Justice B., Trone G., Pistilli E., Vinci D., Haff E., Kilgore L., Haff G. The effects of 8 weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. *J Strength Cond Res*, 2003, 17:425-38.

differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises), indicating that the short-term ingestion of glutamine did not enhance weightlifting performance in resistance-trained men.[22]

60.     Similarly, another study sought to determine whether glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance. Trained males performed five exercise bouts on a cycle ergometer at 100% of maximal oxygen consumption.  The first four bouts were 60 seconds in duration, while the fifth bout was continued to fatigue.  Each bout was separated by 60 seconds of recovery. The exercise bouts were initiated 90 minutes after ingesting either placebo or 0.3 grams/kg of glutamine. Results showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between supplement conditions, indicating that the acute ingestion of L-glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males.[23]

61.     Another study determined whether oral glutamine, by itself or in combination with hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men.  Subjects ingested either placebo or 0.125 grams/kg of

---

[22] Antonio J., Sanders M, Kalman D., Woodgate D., Street C. The effects of high-dose glutamine ingestion on weightlifting performance. *J Strength Cond Res*, 2002, 16:157-60.

[23] Haub M., Potteiger J., Nau K., Webster M., Zebas C. Acute L-glutamine ingestion does not improve maximal effort exercise. *J Sports Med Phys Fitness*, 1998, 38:240-44.

glutamine one hour before completing a brief high-intensity time-trial (approximately four minutes in duration). The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of glutamine ingestion either alone or in combination with hyperoxia. Thus, there was no limiting effect of the tricarboxylic acid intermediate pool size on oxidative metabolism or performance during exercise.[24]

### B. Misrepresentations Regarding Defendant's Products Sold Exclusively at GNC.

62.    After the expiration of the agreement between Defendant and Bodybuilding.com on May 17, 2016, Defendant began selling the Products exclusively through GNC, another dietary supplement retail giant.  GNC also maintains a website where the product pages for the Products reflect the exact descriptive language found on the Products' labels:

**Description**
JYM Supplement Science
Muscle Growth - Strength - Energy - Mind*

My Guarantee
Inside this bottle is decades of supplement research — from the lab and the gym. As a scientist, I have spent years researching ingredients that will produce results. As a gym rat, I have spent years benefiting from that research. Now it's your turn. Every ingredient in this formula is in a dose used in clinical studies and my own gym to produce significant gains in size, strength and endurance.* I know it works because this is what I take before every one of my workouts. Let it work for you. Hit the JYM!

---

[24] Marwood S., Botwell J. No effect of glutamine supplementation and hyperoxia on oxidative metabolism and performance during high-intensity exercise. *J Sports Sci*, 2008, 26:1081-90.

## Description

JYM Supplement Science
Muscle Growth - Endurance - Recovery

Over the decades I have spent in the gym experimenting with how muscles respond to training and the decades I have spent in the lab studying those responses at the cellular level, I have learned that the nutrients you take immediately after working out are just as critical as those you take to prime your body before workouts. After you've put in your last rep, your body is desperate for the ingredients that will help it refuel, recover and, in the process, grow bigger and stronger. Those ingredients, in full research-backed doses, are in this bottle. Post JYM is the perfect companion to Pre JYM. It's my personal post-workout formula for maximizing recovery, muscle growth and performance*. Make it yours to help you optimize your results in the gym. Hit the JYM!

63.    Both the GNC and Bodybuilding.com versions of the Products contain the ingredients at issue here, at the same doses.

64.    The Pre-JYM product states "Every ingredient in this formula is in a dose use[d]? in clinical studies and my own gym to produce significant gains in size, strength and endurance."  As shown above, the majority of these ingredients are not properly dosed, have no scientific backing or simply found to be completely ineffective, making Defendant's claims on the Pre-JYM label demonstrably false.

65.    The Post-JYM product states "Those ingredients, in full research-backed doses, are in this bottle."  As shown above, the majority of these ingredients are not properly dosed, have no scientific backing or simply found to be completely ineffective, making Defendant's claims on the Post-JYM label demonstrably false.

66.    Also, beyond these false claims regarding the ingredients contained

21

within the Products, Jim Stoppani himself on InstaGram admits that the Products contain Sodium even though they are not listed on the labels, as required by state and federal law:



67.     Apparently Defendant believes a social media post will resolve the illegality and omission of a material fact rather than issuing a recall.

68.     Defendant's deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food (including dietary supplements) misbranded when the label contains a statement that is "false or misleading in any particular."

69.     Similarly to the FDCA, Michigan prohibits the misbranding of food through the Food Law Act 92 of 2000 § 289.1101, *et seq*. (the "Act").  The Act

provides that food is misbranded "if its labeling is false or misleading in any particular." *Id*.

70. The Act explicitly incorporates by reference "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the FDCA". *Id*.

71. Defendant's deceptive statements also violate RCW 69.04.250 AND SOUTH CAROLINA ANNOTATED LAWS which also deem food (including dietary supplements) misbranded when the labels contains a statement that is "false or misleading in any particular."

72. The difference between the Products promised and the Products sold is significant and material. The efficacy of ingredients has real impacts on the benefits provided to consumers by the Products and the actual value of the Products.

73. Had Plaintiffs and members of the Class known the true nature of the Products, they would not have purchased Defendant's Products or alternatively paid significantly less for them.

## V. CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

23

**Nationwide Class:** All persons in the United States who purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

**Consumer Fraud Multi-State Class:** All persons in the States of Alabama, California, Florida, Illinois, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Rhode Island, and Wisconsin who purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.[25]

**Michigan Subclass:** All persons in the State of Michigan who purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

**South Carolina Subclass:** All persons in the State of South Carolina who purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

**Washington Subclass:** All persons in the State of Washington who purchased the Products through Bodybuilding.com between July 19, 2013 and May 17, 2016 and through GNC from May 18, 2016 to the present.

Excluded from the Classes are Defendant and their affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial

---

[25] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. 010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

staffs.

75.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

76.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiffs, but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

77.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

(a)    Whether Defendant labels, markets and otherwise advertises its Products in a deceptive, false, or misleading manner;

(b)    Whether Defendant's Products contain any amount of sodium that would warrant its disclosure on the Products' label;

(c)    Whether Defendant's mischaracterization of the Products constitutes

unfair or deceptive acts under RCW 19.86 et seq.;

(d)     The nature and extent of damages, restitution, equitable remedies, and declaratory and injunctive relief to which Plaintiff and the Class are entitled; and

(e)     Whether Plaintiff and the Class should be awarded attorneys' fees and the costs of suit.

78.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

79.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

80.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent, they have retained counsel competent and experienced in complex class action

26

litigation, and they will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

81.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

82.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

83.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this class action. The damages or other financial

detriment suffered by each of the Plaintiffs and the other members of the Classes

are relatively small compared to the burden and expense that would be required to

individually litigate their claims against Defendants, so it would be impracticable

for Class members to individually seek redress for Defendant' wrongful conduct.

Even if Class members could afford individual litigation, the court system could

not. Individualized litigation would create a potential for inconsistent or

contradictory judgments, and increases the delay and expense to all parties and the

court system. By contrast, the class action device presents far fewer management

difficulties, and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court.

## VI.   CLAIMS ALLEGED

### COUNT I

**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Consumer Fraud Multi-State Class)**

84.    Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth

herein.

85.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-

State Class[26] (for purposes of this Count, the "Class") prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

86. Plaintiffs and members of the Class have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class because Plaintiffs and members of the Class have suffered an injury-in-fact and lost money as a result of Defendant's actions as set forth herein.

87. Defendant intended that Plaintiffs and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

88. As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and each of the other members of the Consumer Fraud Multi-State Class have sustained actual/ascertainable damages in an amount to be proven at trial.

89. In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive, treble and/or statutory damages is appropriate.

---

[26] California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. 010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

## COUNT II

### Breach Of Express Warranties
### (On Behalf Of The Nationwide Class and All Subclasses)

90.     Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

91.     Plaintiffs, and each member of the Nationwide Class, formed a contract with Defendant when Plaintiffs and the other members of the Nationwide Class purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Nationwide Class and Defendant.

92.     Plaintiffs and the members of the Nationwide Class performed all conditions precedent to Defendant' liability under this contract when they purchased the Products.

93.     Defendant breached express warranties about the Products and their qualities because Defendant' statements about the Products were false and the Products do not conform to Defendant' affirmations and promises described above.

94.     Plaintiffs and the members of the Nationwide Class would not have

purchased or used the Products had they known the true nature of the Products.

95.    As a result of Defendant' breach of express warranties, Plaintiffs and each member of the Nationwide Class has been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

## COUNT III

**Breach Of Implied Warranties**
**(On Behalf Of The Nationwide Class and All Subclasses)**

96.    Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

97.    Defendant knew and intended that the members of the Nationwide Class would be the ultimate consumers of the Products.

98.    Defendant sold the Products into the stream of commerce, and Defendant are merchants with respect to goods such as the Products at issue.

99.    The Products were not merchantable at the time of sale, because they did not—nor could not—have any impact related to the representations as alleged herein.

100.   Plaintiffs and the other members of the Nationwide Class did not receive the benefit of their bargain in purchasing the Products.

101.   Because of Defendant' breach of implied warranties, the Plaintiffs and

each member of the Nationwide Class has been damaged in the amount of the

purchase price of the Products and any consequential damages resulting from their

purchases.

## COUNT IV

**Negligent Misrepresentation**
**(On Behalf Of The Nationwide Class and All Subclasses)**

102.   Plaintiffs incorporate paragraphs 1 through 82 as if fully set forth

herein.

103.   Defendant has made material misrepresentations of fact concerning

the nature of, and ingredients in, the Products.

104.   Defendant has and had no reasonable basis for believing that their

misrepresentations were true.

105.   Defendant knew, or should have known, that Plaintiffs and the

members of the Nationwide Class would rely on the false representations about the

nature of, and ingredients in, the Products.

106.   Defendant's false representations about the ingredients of the Products

are objectively material to reasonable consumers, and therefore reliance upon such

representations may be presumed as a matter of law.

107.   Plaintiffs and members of the Nationwide Class reasonably relied to

their detriment on Defendant' false representations, which caused them to purchase

the Products.

108.   As a proximate result of Defendant's negligent misrepresentations, Plaintiffs and each member of the Nationwide Class has been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

## COUNT V

### Intentional Misrepresentation
### (On Behalf Of The Nationwide Class and All Subclasses)

109.   Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

110.   Defendant has intentionally made material misrepresentations of fact concerning the nature of, and ingredients in, the Products.

111.   Defendant knew that the intentional misrepresentations herein were false at the time they were made.

112.   Defendant intended that Plaintiffs and members of the Nationwide Class would rely on the false representations and purchase Defendant' Products.

113.   Defendant' false representations are objectively material to reasonable consumers and therefore reliance upon such representations may be presumed as a matter of law.

114.   Plaintiffs and members of the Nationwide Class reasonably relied to

their detriment on Defendant's intentional misrepresentations.

115.   Defendant' intentional misrepresentations were a substantial factor in causing Plaintiffs and members of the Nationwide Class to purchase the Products.

116.   Defendant has acted with malice by engaging in conduct that was and is intended to cause injury to Plaintiffs and the members of the Nationwide Class.

117.   Defendant has committed fraud through their intentional misrepresentations, deceit, and/or concealment of material facts known to Defendant with the intent to cause injury to the purchasers of the Products.

118.   As a proximate result of Defendant's intentional misrepresentations, Plaintiffs and the members of the Nationwide Class suffered an ascertainable loss and are entitled to relief and compensatory and punitive damages, in an amount to be determined at trial.

### COUNT VI

**Unjust Enrichment**
**(In The Alternative To Counts II and III,**
**On Behalf Of The Nationwide Class and All Subclasses)**

119.   Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

120.   Plaintiffs and the other members of the Nationwide Class conferred benefits on Defendant by purchasing the Products.

121.   Defendant has been unjustly enriched by their retention of the

revenues derived from the purchases of the Products by Plaintiffs and the other members of the Nationwide Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the other members of the Nationwide Class because they would not have purchased the Products if the true facts would have been known.

122.   Because Defendant' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the other members of the Nationwide Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the members of the Nationwide Class for their unjust enrichment, as ordered by the Court.

<u>**COUNT VII**</u>

**Violation Of The Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.901 *et seq.***
**(In The Alternative To Count I And On Behalf Of The Michigan Subclass)**

123.   Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

124.   Plaintiff Johnston (for the purpose of this Count, "Plaintiff") brings this Count on behalf of himself and the Michigan Subclass against the Defendant.

125.   Plaintiff and the members of the Michigan Subclass have standing to pursue a cause of action for violation of the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. Laws §§ 445.901, *et seq.*, because Plaintiff and

35

members of the Michigan Subclass have suffered an injury-in-fact and lost money as a result of Defendant's actions as set forth herein.

126.  Plaintiff and the Michigan Subclass members were "person[s]" within the meaning of the MCPA.

127.  At all relevant times, Defendant was a "person" engaged in "trade or commerce" within the meaning of the MCPA.

128.  Plaintiff and Michigan Subclass members acted as consumers, purchasing the Products for personal, family or household purposes.

129.  The Products qualify as a "good," or "merchandise," under the MCPA and the Michigan Subclass' purchases of the Products constitute a "transaction."

130.  The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Defendant engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the MCPA.

131.  Defendant, in connection with the sale of the Products, engaged in deceptive, unconscionable, unfair, fraudulent and misleading commercial practices.

132.  Defendant concealed, suppressed, or omitted material facts with the intent that Plaintiff and Michigan Subclass members rely upon such concealment, suppression or omissions. Defendant's objectively deceptive conduct had the

capacity to deceive reasonable consumers under the circumstances.

133.   Defendant's practices, acts, and course of conduct in marketing and selling the Products are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment. Like Plaintiff, members of the Michigan Subclass would not have purchased the Products had they known the true nature of the ingredients.

134.   Defendant's general course of conduct impacted the public because the acts were part of a generalized course of conduct affecting numerous consumers.

135.   Defendant's conduct, which included deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts caused the resulted injury in fact and an actual loss of money or property to Plaintiff and the Michigan Subclass. The resulting injury to Plaintiff and the members of the Michigan Subclass was reasonably foreseeable by Defendant.

136.   Based on Defendant's acts stated herein, Defendant is in violation of the MCPA. Defendant violated the MCPA by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Products.

37

137.   Plaintiff, on behalf of themselves and the members of the Michigan Subclass, seek injunctive relief to enjoin Defendant from continuing their unfair and deceptive acts; monetary relief against Defendant for actual damages in an amount to be determined at trial; reasonable attorneys' fees; and any other just and proper relief available under the MCPA.

## COUNT VIII

**Violation of The South Carolina Consumer Protection Code
(S.C. Code Ann. § 37-1-103 *et seq*.)
(On Behalf of the South Carolina Sub-class)**

138.   Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

139.   Defendant engaged in unfair and deceptive acts or practices, including but not limited to engaging in part of a scheme or plan to mischaracterize the Products' ingredients. These acts and practices had the capacity to deceive a substantial portion of the public.

140.   Defendant's unfair deceptive acts or practices occurred in the conduct of trade or commerce in that Defendant was engaged in the sale of the Products.

141.   Defendant's unfair or deceptive acts or practices have an impact on the public interest because Defendant deceived consumers as to the characteristics, ingredients and attributes of its Products. Such misrepresentations cause financial

38

harm to purchasers who would not have otherwise purchased the Products or would have paid less.

142.   Plaintiff relied on Defendant's misrepresentations.

143.   As a result, Plaintiff suffered damages to his property and business, in the form of economic and financial damages in addition to costs and reasonable attorneys' fees.

## COUNT IX

**Violation of The Washington Consumer Protection Act**
**(Wash. Rev. Code § 19.86.010 *et seq*.)**
**(In The Alternative To Count I And On Behalf of the Washington Sub-**
**class)**

144.   Plaintiffs incorporate paragraphs 1 through 83 as if fully set forth herein.

145.   Defendant engaged in unfair and deceptive acts or practices, including but not limited to engaging in part of a scheme or plan to mischaracterize the Products' ingredients. These acts and practices had the capacity to deceive a substantial portion of the public.

146.   Defendant's unfair deceptive acts or practices occurred in the conduct of trade or commerce in that Defendant was engaged in the sale of the Products.

147.   Defendant's unfair or deceptive acts or practices have an impact on the public interest because Defendant deceived consumers as to the characteristics,

39

ingredients and attributes of its Products. Such misrepresentations cause financial harm to purchasers who would not have otherwise purchased the Products or would have paid less.

148.   Plaintiff relied on Defendant's misrepresentations.

149.   As a result, Plaintiff suffered damages to his property and business, in the form of economic and financial damages in addition to costs and reasonable attorneys' fees.

## VII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims in this Complaint so triable. Plaintiffs also respectfully request leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes proposed in this Complaint, respectfully request that the Court enter judgment as follows:

A.    Declaring that this action is a proper class action, certifying the Class and Subclasses requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

B.    Ordering Defendant to pay actual damages to Plaintiffs and the other members of the Class and allowing each Plaintiff and Class member to rescind their purchases;

C.    Ordering Defendant to pay statutory damages, as provided by the applicable state consumer protection statutes, invoked above, to Plaintiffs and the other members of the Class;

D.   Ordering Defendant to pay restitution to Plaintiffs and the other members of the Class;

E.   Enjoining Defendant from engaging in the unlawful conduct set forth herein, as provided by the applicable state consumer protection statutes invoked above;

F.   Ordering Defendant to pay attorneys' fees and litigation costs;

G.   Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.   Ordering such other and further relief as may be just and proper.

Dated: November 26, 2016

JEFF JOHNSTON, JOHN SANDVIKS AND TANNER KIRCHOFF, individually and on behalf of all others similarly situated,

By: */s/ Nick Suciu III*

An Attorney for Plaintiffs and the putative class

Nick Suciu III (P72052)
BARBAT, MANSOUR & SUCIU PLLC
1644 Bracken Rd.
Bloomfield Hills, Michigan 48302
(313) 303-3472
nicksuciu@bmslawyers.com

Jonathan N. Shub
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700
jshub@kohnswift.com
*Attorneys for Plaintiffs and the Putative Class*

41

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was electronically filed with the United States District Court for the Eastern District of Michigan this 26th day of November, 2016, using the Court's CM/ECF System, which served notice of the filing upon all counsel of record.

<u>*/s/ Nick Suciu III*</u>